[No. 22768–8–I. Division One. July 16, 1990.]

THE STATE OF WASHINGTON, *Respondent*, v. ARNE
HUGH STEVENS, *Appellant.*

480

*Rita Griffith* of *Washington Appellate Defender Association,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Anthony Shapiro* and *Donna Wise, Deputies,* for respondent.

WINSOR, J.—Arne Hugh Stevens appeals his conviction and sentence for two counts of statutory rape in the first degree. Stevens received an exceptional sentence of 94 months on each count, to be served concurrently. We affirm the conviction and the sentence, but delete a condition from the sentence requiring Stevens to complete a sexual deviancy program upon release.

On August 28, 1987, the five children of the S. family were removed from their mother's home by the Department of Social and Health Services (DSHS) and placed in foster homes. At the time they were removed from the house, the children were all under the age of 7: C was age 6; L was age 5; D was age 3; N was age 2; and T was age 1.

Stevens regularly baby–sat the S. children prior to their removal from the family home. On November 23, 1987, almost 3 months after the children were placed in foster care, D disclosed that she had been sexually abused by Stevens. At the time of the disclosure, D was jumping on the couch at her foster home. Her foster mother, Marilyn Williams, asked her "What am I going to do with you?" D replied, "Well, you know, Arne stuck my head in the toilet until my face and my head got wet. And he stuck his fingers in my pee pee."

Williams relayed this disclosure to Kelsey Tyler, another foster mother who was taking care of some of the S. children. The same day, Tyler called Cheryl Baddinger, C's foster mother. Baddinger told C that D had "told the secret about Arne", but did not disclose specifically what D had said. C started to cry, and later that evening told Baddinger that Stevens had put his fingers up her private part. That same evening, C called Tyler and disclosed that Stevens had touched her genitals and had put his fingers inside her.

Over the following month, C made subsequent disclosures to Tyler concerning sexual abuse by Stevens. About 3 months after the initial disclosures, C separately disclosed to Tyler and Baddinger penile penetration by Stevens.

D also made subsequent disclosures to Tyler.[1] According to Tyler, D would make random statements disclosing abuse without any forewarning. She also exhibited sexual behavior abnormal for a child her age.

Both C and D made similar disclosures to Detective Robin Fenton of the King County Special Assault Unit. C made another disclosure to Mary Jane Peyton, the caseworker assigned to the case. Finally, C and D also made disclosures to Dr. Carrie Julian, a physician who examined both girls at the Harborview Medical Center Pediatric Sexual Assault Clinic.

Stevens was charged with five counts of first degree statutory rape, one count involving each of the S. children. Prior to trial and upon motion by the defense, the trial court conducted an in camera review of the DSHS records (concerning the removal of the children from the mother's home) and records from the Sexual Assault Clinic. The court made a number of disclosures from the files.

The trial court also held a hearing to determine the competency of the children as witnesses and the admissibility of their hearsay statements, as detailed earlier, under RCW 9.94A.120. After hearing examination of C, L and D, the trial court determined that only C was competent to testify.

In considering the admissibility of the hearsay statements, the trial court heard the testimony of Williams, Detective Fenton, Tyler, Baddinger, Dr. Julian and Jacqueline Stevens, the defendant's sister. Ms. Stevens testified that she had also baby–sat the children. Through Ms. Stevens' testimony, the defense attempted to show that C, who had taken on the caretaker role in the family, felt

---

[1] D was moved from Williams' home to Tyler's home in December 1987.

resentment toward Stevens because he usurped her authority when he baby–sat. The defense postulated that C retaliated by fabricating the story of sexual abuse by Stevens.

After hearing the testimony, the trial court made a blanket ruling admitting all the hearsay statements made by C and D. In ruling, the court did not single out statements and analyze them for reliability, but for the most part focused on the reliability of the witnesses.

The court also admitted statements C and D made while sleeping, apparently during nightmares. At the pretrial hearing, three of the foster mothers testified that both C and D had recurring nightmares in which they would shout words such as "Arne, don't" and "Arne, stop, Arne, don't, please don't."

At trial, the State presented all the evidence as set out previously. The State also presented two additional witnesses, the children's natural mother and Dr. Carol Jenny, a child sex abuse expert. Dr. Jenny testified that sexually abused children exhibit common behaviors such as bedwetting, nightmares, sexual acting out, anger and other difficult behaviors. While testifying, she used a colposcopy photograph of C's vagina to point out physical evidence of sexual abuse.

The defense called one witness, Ms. Stevens. The jury returned verdicts of guilty on the counts involving C and D, and not guilty on the counts involving L, N and T.

Stevens received an exceptional sentence of 94 months for each count, to be served concurrently. The court based the exceptional sentence on two aggravating factors:

> 1. The victim in count III, [D,] was extremely vulnerable by virtue of her tender years.
> 2. The defendant was in a position of trust to the children he abused as a babysitter.

The court also imposed a condition upon Stevens' release: "Upon release defendant shall enter an intensive in–patient or out–patient sexual deviancy treatment program as recommended by a sexual deviancy therapist."

Stevens appeals his convictions, contending that the trial court erred by: (1) making inadequate disclosure of DSHS and Sexual Assault Clinic records to the defense; (2) admitting child hearsay statements; (3) admitting statements made by C and D during their sleep; (4) admitting the colposcopy photograph; (5) admitting testimony by the DSHS caseworker, Peyton, that children do not lie when making allegations of sexual abuse; and (6) admitting expert testimony by Dr. Jenny concerning behavioral symptoms of child abuse. Finally, he argues that cumulative error denied him a fair trial. In appealing his sentence Stevens assigns error to the trial court's findings of abuse of trust and vulnerability of the victim, and argues that the sentence imposed is clearly excessive. Finally, he argues that the trial court erred in imposing the condition of release requiring him to complete a sexual deviancy program.

# I
## ISSUES ARISING FROM TRIAL

A. *In camera review of DSHS and Sexual Assault Clinic records to the defense.*

Stevens first assigns error to the trial court's in camera review of and disclosures from the DSHS and the Sexual Assault Clinic records.

 In order to properly review the trial court's disclosures, we have examined the sealed records. *State v. Mines,* 35 Wn. App. 932, 939, 671 P.2d 273 (1983), *review denied,* 101 Wn.2d 1010 (1984); *see State v. Casal,* 103 Wn.2d 812, 822–23, 699 P.2d 1234 (1985); *see generally Pennsylvania v. Ritchie,* 480 U.S. 39, 94 L. Ed. 2d 40, 107 S. Ct. 989 (1987). Because the scope of discovery is within the discretion of the trial court, we review the trial court's determination for manifest abuse of discretion. *Mines,* 35 Wn. App. at 938.

We have found only two entries which arguably should have been, but were not, disclosed. We hold that the trial

court did not abuse its discretion in failing to disclose these two items.

## B. *Admission of child hearsay statements.*

Stevens next argues that the trial court erred in admitting, pursuant to the child hearsay statute, RCW 9A.44.120,[2] hearsay statements made by C and D. Stevens objects to the trial court's analysis of the reliability of these statements under *State v. Ryan*, 103 Wn.2d 165, 175–76, 691 P.2d 197 (1984).[3] Specifically, he argues that the trial court abused its discretion in applying the *Ryan* factors to the out–of–court statements of each child collectively, rather than individually, to each statement.

■ Stevens failed to object to the trial court's method of analysis of reliability at trial. Objections to the admission of evidence will not be considered for the first time on appeal

---

[2]RCW 9A.44.120 provides:

"**Admissibility of child's statement—Conditions.** A statement made by a child when under the age of ten describing any act of sexual contact performed with or on the child by another, not otherwise admissible by statute or court rule, is admissible in evidence in . . . criminal proceedings in the courts of the state of Washington if:

"(1) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability; and

"(2) The child either:

"(a) Testifies at the proceedings; or

"(b) Is unavailable as a witness: *Provided,* That when the child is unavailable as a witness, such statement may be admitted only if there is corroborative evidence of the act."

[3]The test for reliability of hearsay statements under *Ryan* is: "'(1) whether there is an apparent motive to lie; (2) the general character of the declarant; (3) whether more than one person heard the statements; (4) whether the statements were made spontaneously; and (5) the timing of the declaration and the relationship between the declarant and the witness.' . . . We [add] that these factors [are] not exclusive and should be considered with the additional factors in *Dutton v. Evans*, 400 U.S. 74, 88–89, 27 L. Ed. 2d 213, 91 S. Ct. 210 (1970): (1) the statement contains no express assertion about past fact, (2) cross examination could not show the declarant's lack of knowledge, (3) the possibility of the declarant's faulty recollection is remote, and (4) the circumstances surrounding the statement . . . are such that there is no reason to suppose the declarant misrepresented defendant's involvement." *Ryan*, 103 Wn.2d at 175–76 (quoting *State v. Parris*, 98 Wn.2d 140, 146, 654 P.2d 77 (1982)).

unless based upon the same ground asserted at trial. *State v. Hayes,* 37 Wn. App. 786, 790, 683 P.2d 237, *review denied,* 102 Wn.2d 1008 (1984). However, we must consider whether the admission of evidence is a "manifest error affecting a constitutional right", even though not raised at trial. RAP 2.5(a); *State v. Frey,* 43 Wn. App. 605, 609–10, 718 P.2d 846 (1986).

■ In Washington, admission of hearsay evidence lacking sufficient indicia of reliability violates a defendant's Sixth Amendment right of confrontation. *Ryan,* 103 Wn.2d at 169–70; *Frey,* 43 Wn. App. at 610; *State v. Jackson,* 42 Wn. App. 393, 398, 711 P.2d 1086 (1985). If both the child hearsay declarant and the hearsay recipient testify at trial and are available for cross examination, however, no constitutional confrontation or due process concerns arise. *State v. Leavitt,* 111 Wn.2d 66, 71, 758 P.2d 982 (1988); *State v. Warren,* 55 Wn. App. 645, 649–50, 779 P.2d 1159 (1989), *review denied,* 114 Wn.2d 1004 (1990). Thus, error is not "'truly of constitutional magnitude'" and not preserved for appellate review if the declarant and recipient witnesses are available to testify and subject to cross examination. *Warren,* 55 Wn. App. at 650. Thus, only error as to statements made by the nontestifying witness, D, is preserved for appellate review.

■ Turning to the merits, Stevens is correct in his assertion that the trial judge erred in his analysis of reliability under the *Ryan* factors. RCW 9A.44.120(1) clearly requires the trial court to review "the time, content, and circumstances of the statement [for] sufficient indicia of reliability". The plain language of the statute indicates that the individual statements are the proper focus of the inquiry. The *Ryan* opinion itself stressed the need to evaluate the statement at the time it is made:

> Adequate indicia of reliability must be found in reference to circumstances surrounding the making of the out–of–court statement, and not from subsequent corroboration of the criminal act. "The circumstantial guarantees of trustworthiness on which the various specific exceptions to the hearsay rule are

based are those that existed at the time the statement was made and do not include those that may be added by using hindsight."

103 Wn.2d at 174 (quoting *Huff v. White Motor Corp.*, 609 F.2d 286, 292 (7th Cir. 1979)). In addition, several of the *Ryan* factors themselves indicate that an important part of the inquiry is an analysis of the surrounding circumstances at the time the statement was made: how many people heard the statement, whether the statement was made spontaneously, the timing of the declaration, the declarant's relationship to the recipient witness and the circumstances surrounding the statement. Thus, the trial court should have applied the *Ryan* factors to each statement offered for admission in order to properly test reliability.

■ The trial court erred by misapplying the *Ryan* factors; thus, it did not adequately test the statements for reliability. Nevertheless, when the reliability of the statements at issue is apparent from the record, this court may affirm their admissibility. *See State v. Jackson*, 46 Wn. App. 360, 368, 730 P.2d 1361 (1986). This record is sufficient to allow review of the reliability of the statements by the appellate court.

Pursuant to *Ryan,* we have analyzed each of the statements admitted. We affirm the trial court's admission of the child hearsay statements.[4] Because there are numerous statements and the analysis of each statement is of no precedential value, we do not publish that portion of the opinion. *See* RCW 2.06.040; CAR 14.

C. *Admission of utterances made by the children during their sleep.*

Stevens also argues that the court erred by admitting into evidence statements C and D made in their sleep. He contends that the statements were irrelevant and highly prejudicial.

---

[4]Although we find that Stevens has waived objection to the admissibility of C's statements, we nevertheless examine them, as well as D's statements, for reliability.

The foster mothers testified that both C and D had nightmares in which they would cry out statements such as "Arne, stop. Arne don't." At the pretrial hearing, Dr. Julian testified that nightmares and sleeping difficulties are common among sexually abused children. Largely on the basis of Dr. Julian's testimony, the court found the statements to be relevant evidence admissible as nonhearsay. In balancing probative value against prejudice, the court reasoned that the prejudice to the defendant was not too great because the statements uttered during the nightmares did not allege sexual abuse. The judge found compelling the fact that two children living in separate homes had nightmares in which they screamed out the defendant's name.

No Washington authority exists on the issue of admissibility of statements made while the declarant is sleeping. Authority from other jurisdictions is split. *See* Annot., *Admissibility of Evidence Concerning Words Spoken While Declarant Was Asleep or Unconscious,* 14 A.L.R.4th 802 (1982 & Supp. 1989). Two rather contradictory rationales have guided courts considering this question. Courts finding such evidence inadmissible reason that sleep statements are wholly unreliable because they are simply utterances made without reasoning. *Plummer v. Ricker,* 71 Vt. 114, 41 A. 1045 (1898). Other courts, finding such statements admissible, have reasoned that since the sleeping person has no opportunity to falsify his or her statements, they may be particularly apt to be truthful. *See* Annot., *supra* at 804.

Most courts faced with this question have analyzed it under the hearsay rule and its exceptions. *See Godfrey v. State,* 258 Ga. 28, 365 S.E.2d 93 (1988) (dream statement by child held inadmissible under child hearsay statute); *State v. Posten,* 302 N.W.2d 638, 641, 14 A.L.R.4th 793 (Minn. 1981) (dream statement by child held admissible under a catchall exception to the hearsay rule); *Plummer,* 41 A. at 1045 (dream statement by victim of dog biting held inadmissible hearsay).

*Posten* involved facts very similar to ours. There the trial court admitted testimony that a child victim of sex abuse had frequent nightmares and would say, "'Ray, stop. Stop it, Ray. Stop it. Stop it.'" 302 N.W.2d at 640. "Ray" apparently referred to the defendant. The court found the evidence admissible under a catchall exception to the hearsay rule. The court stated:

> We believe that each case has to be considered on its own. It may be that generally evidence of this sort would be untrustworthy. Here, however, we are not dealing with a conniving person who was out to get someone by faking a bad dream, but with a child who obviously had suffered.

302 N.W.2d at 641. Important to the court's decision was the fact that the nightmare statement was evidence used primarily for corroborative purposes.

While we agree with the reasoning and concerns set forth in *Posten* concerning trustworthiness and corroboration, we disagree that sleep statements are properly analyzed as hearsay. We believe the trial judge in this case was correct in analyzing the testimony as nonhearsay, under relevance principles. Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." ER 801(c). A "statement" is defined as an "oral or written *assertion* or . . . nonverbal conduct of a person, if it is intended by him as an assertion." (Italics ours.) ER 801(a). Key to the determination of whether these sleep statements were hearsay is whether they were "assertions". Although the rule does not expressly define the term, the Federal Rules of Evidence advisory committee's note explains that "nothing is an assertion unless intended to be one." Fed R. Evid. 801(a) advisory committee note, *reprinted in* R. Aronson, *Evidence in Washington,* at 801–4 (1989); *see In re Penelope B.,* 104 Wn.2d 643, 652, 709 P.2d 1185 (1985) ("The test is whether [the utterance] was intended as an assertion or not."). Thus, the declarant must intend to make the statement in order for it to be hearsay.

The Washington Supreme Court discussed the definition of hearsay at length in *Penelope B.* In analyzing whether certain conduct and statements of a child were hearsay, the court stated:

> Many out–of–court *utterances* fall within such categories as greetings, pleasantries, expressions of joy, annoyance or other emotions when they are not intentional expressions of fact or opinion; hence, they are not assertions for purposes of the hearsay rule.
>
> . . . .
> The admissibility of nonassertive verbal or nonverbal conduct as circumstantial evidence of a fact in issue is governed by principles of relevance, not by hearsay principles.

(Footnote omitted.) 104 Wn.2d at 652–53. The court described some specific examples of nonassertive utterances and conduct:

> For example, if in a child abuse case someone walks into a place where the child is, or that person's name is mentioned, and the child involuntarily reacts by trembling, running and hiding, screaming, crying, shouting "I hate you" or the like, then such would be nonassertive utterances or nonverbal conduct and not hearsay. . . . Such testimony is admissible.

*Penelope B.,* 104 Wn.2d at 654.

The utterances made by C and D during their sleep are not conscious, intentional assertions of fact or opinion. The nightmare statements are involuntary verbal reactions, and, as such, are nonassertive utterances and not hearsay. *See Posten,* 302 N.W.2d at 642–43 (Wahl, J., concurring). Rather, the utterances are circumstantial evidence that proves a fact indirectly: that both children had nightmares involving Stevens. The relevance of this evidence does not turn on the truth of the content of the statements, but is derived from the fact they were made. The witnesses who heard the statements testified to a matter of which they had personal knowledge—what the children said during their sleep. *Penelope B.,* 104 Wn.2d at 653–54. Thus, the statements' admissibility is determined by the principles of relevance.[5]

---

[5]Relevant evidence is that evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the action more

In determining the relevancy of the evidence, the trial court relied on competent expert testimony that nightmares are a common symptom of sexual abuse.[6] Therefore, the evidence had relevance and was probative of the fact that the children experienced emotional trauma that they associated with Stevens. The sleep statements are particularly compelling because two children living in different homes had nightmares in which they yelled out the defendant's name. Although certainly prejudicial to Stevens, the utterances did not contain direct allegations of sexual abuse. The trial court was correct in concluding that the probative value outweighed the prejudicial impact; hence, the trial court did not abuse its discretion in admitting the evidence. The weight accorded to the evidence was up to the jury. *Penelope B.*, 104 Wn.2d at 655.

D. *Admission of colposcopy photograph.*

Next, Stevens challenges the trial court's admission of a colposcopy photograph that showed physical evidence of

---

probable or less probable than it would be without the evidence." ER 401. Under ER 403, relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury". The trial judge has considerable discretion in balancing the probative value of evidence against its potential prejudicial impact. *State v. Hughes*, 106 Wn.2d 176, 201, 721 P.2d 902 (1986). A trial court's decision to admit relevant evidence will not be reversed absent a manifest abuse of discretion. *Hughes*, 106 Wn.2d at 202.

[6]There is substantial support for the theory that recurring dreams or nightmares are a common symptom of sexual abuse: Conte & Berliner, *The Impact of Sexual Abuse on Children: Empirical Findings*, in *Handbook on Sexual Abuse of Children* 72 (L. Walker ed. 1988); Lusk & Waterman, *Effects of Sexual Abuse on Children*, in *Sexual Abuse of Young Children* 101 (K. MacFarlane, J. Waterman, S. Conerly, L. Damon, M. Durfee, & S. Long eds. 1986); Kiser, Ackerman, Brown, Edwards, McColgan, Pugh & Pruitt, *Post–Traumatic Stress Disorder in Young Children: A Reaction to Purported Sexual Abuse*, 27 J. of Am. Acad. of Child & Adolescent Psychiatry 645, 646–47 (1988); Mannarino & Cohen, *A Clinical–Demographic Study of Sexually Abused Children*, 10 Child Abuse & Neglect 17, 21–22 (1986); Terr, *The Child Psychiatrist and the Child Witness: Traveling Companions by Necessity, if Not by Design*, 25 J. of Am. Acad. of Child Psychiatry 462, 464–65 (1986); *see* Foa, Steketee & Olasov Rothbaum, *Behavioral/Cognitive Conceptualizations of Post–Traumatic Stress Disorder*, in 20 *Behavior Therapy* 155 (1989).

injury to C's vagina. Stevens contends that the photograph is irrelevant because the fact of injury to C's vagina was not in dispute and the prosecution could have presented the same evidence without using the inflammatory photograph.

 Photographic evidence, even if gruesome, is admissible if accurate and the probative value outweighs the prejudicial effect of such evidence. This determination is left to the discretion of the trial court, and the trial court's ruling will not be disturbed on appeal absent abuse of discretion. *State v. Crenshaw,* 98 Wn.2d 789, 806, 659 P.2d 488 (1983); *State v. Kendrick,* 47 Wn. App. 620, 624, 736 P.2d 1079, *review denied,* 108 Wn.2d 1024 (1987).

In reviewing the trial court's admission of the photograph, we examine whether the photo is probative evidence tending to prove an element of the crime that is in issue, whether it assists the jury in understanding some aspects of the crime and whether it 5 assists the witness in explaining a theory to the jury. *Kendrick,* 47 Wn. App. at 625. This court should also consider whether a diagram could have revealed the same information in a nonprejudicial manner. *State v. Sargent,* 40 Wn. App. 340, 349, 698 P.2d 598 (1985).

 In this case, Stevens has failed to provide the photograph as part of the record on appeal. Failure to attach exhibits to the record may preclude appellate review of an assignment of error attacking their admission. *Lewis v. Bertero,* 198 Wash. 296, 310, 88 P.2d 433 (1939); *Cozard v. Cozard,* 48 Wash. 124, 125, 92 P. 935 (1907).

Even if the alleged error were properly before us, it is doubtful that the trial judge abused his discretion. This court has recently upheld the admission of colposcopy photographs on relevancy grounds. *State v. Noltie,* 57 Wn. App. 21, 30, 786 P.2d 332, *review granted,* 114 Wn.2d 1019 (1990). In addition, the trial judge here found that the photograph was not inherently gruesome or prejudicial, and that two purposes supported admission: to show the

unusual size of the vagina, and to aid Dr. Jenny in explaining to the jury her finding of muscle or tissue tears in C's vagina, which could be the result of attempted intercourse.

It is undisputed that the photo was an accurate depiction of the physical evidence of penetration. Thus, it is probative of the crime charged, statutory rape. Although the doctor could have made a drawing, the photo presumably was a clearer and more accurate depiction of the hymenal tear. *See State v. Daniels,* 56 Wn. App. 646, 650, 784 P.2d 579, *review denied,* 114 Wn.2d 1015 (1990). It assisted the doctor in explaining her findings and likely assisted the jury in analyzing medical evidence. Absent any indication from the record that the photo was especially gruesome or inherently prejudicial, the trial court was within its discretion in admitting it into evidence.

E. *Admission of opinion testimony on the veracity of child sexual abuse victims.*

Stevens also argues that it was error to admit opinion testimony by the DSHS caseworker, Mary Jane Peyton, that it is unusual for young children to lie when disclosing sexual abuse. He contends that this evidence invaded the province of the jury and deprived him of his right to a fair trial.

As Peyton was testifying, the following exchange occurred:

Q: [Were] there ever any situations where a young child, during the course of disclosing that to you, may say some inconsistent things?

A: It is possible for them to say inconsistent things, but it is not—it is very unusual that a child, a young child will lie. In fact, I have never run into it.

At this point, defense counsel objected, asserting lack of foundation. The court simply said, "Well, next question." During the next recess, defense counsel brought up the objection and argued to the court that the statement invaded the province of the jury. The court replied that the defense should have made a motion to strike on the basis of nonresponsiveness. If that had been done, the court stated

that it could have instructed the jury to disregard the answer as unresponsive. However, since the defense made no such motion, the court felt it did not have any appropriate basis on which to instruct the jury. Following this exchange, defense counsel did not make any further motion.

The State concedes that Peyton should not have testified in this manner, but argues that the defense waived objection because it failed to timely object on the proper ground.

▮ A party may only assign error in the appellate court on the specific ground of the evidentiary objection made at trial. *State v. Guloy,* 104 Wn.2d 412, 422, 705 P.2d 1182 (1985), *cert. denied,* 475 U.S. 1020, 89 L. Ed. 2d 321, 106 S. Ct. 1208 (1986); *State v. Smith,* 15 Wn. App. 716, 722, 552 P.2d 1059 (1976). The important purpose served by this rule is to afford the trial court the opportunity to prevent or cure the error. *State v. Madison,* 53 Wn. App. 754, 762–63, 770 P.2d 662, *review denied,* 113 Wn.2d 1002 (1989); *see State v. Boast,* 87 Wn.2d 447, 451, 553 P.2d 1322 (1976). By failing to object on proper grounds or moving to strike, Stevens did not give the trial court an opportunity to remedy the defect. Therefore, under *Guloy,* this issue is not properly before this court.

Stevens seeks to avoid operation of this rule by asserting a constitutional basis to the alleged error. As discussed previously, manifest constitutional error is reviewable for the first time on appeal. RAP 2.5(a)(3); *State v. Frey,* 43 Wn. App. 605, 609–10, 718 P.2d 846 (1986). *State v. Scott,* 110 Wn.2d 682, 688, 757 P.2d 492 (1988) sets forth the standard for analyzing whether manifest constitutional error is present:

> The proper way to approach claims of constitutional error asserted for the first time on appeal is as follows. First, the appellate court should satisfy itself that the error is truly of constitutional magnitude—that is what is meant by "manifest". If the asserted error is not a constitutional error, the court may refuse review on that ground. If the claim is constitutional, then the court should examine the effect the error had on the

defendant's trial according to the [constitutional] harmless error standard . . ..

(Footnote omitted.)

In *Madison,* under facts very similar to this case, the court found no manifest constitutional error. 53 Wn. App. at 763. There a caseworker testified that the victim's masturbation was "'typical of a sex abuse victim'"; that when the victim spoke to her, "'it was obvious she was very relieved, very comfortable that she was not needing to maintain the secret'"; and that the victim waited to make her accusations because "'she was very clearly aware of the impact her disclosure would have on many people whom she loved.'" 53 Wn. App. at 760. On appeal, the defense asserted that the testimony amounted to a statement of belief in the victim's story, thus invading the province of the jury. However, the defense had failed to object to the testimony at trial. Accordingly, the court applied the *Scott* analysis and found no manifest constitutional error.

 Here the offending testimony was less prejudicial than was the testimony in *Madison.* In *Madison,* the caseworker was testifying specifically about the child victim. Peyton testified only that in her experience children in general do not lie; she did not testify that C and D in particular were being truthful. More importantly, just as in *Madison,* the caseworker here did not explicitly assert that she believed C's or D's story. In sum, Peyton's testimony was not based on the credibility of the victims, and does not impermissibly invade the province of the jury. *See State v. Fitzgerald,* 39 Wn. App. 652, 657, 694 P.2d 1117 (1985).[7] Thus, we find that the error here was not "truly of constitutional magnitude" and Stevens may not raise it for the first time on appeal.

---

[7]In *Fitzgerald,* an expert physician testified that she believed the two victims in a sexual abuse case had been molested. She based her testimony solely on her evaluation of the children's version of the events. The Court of Appeals found, in dicta, that the trial court had committed reversible error in permitting the opinion into evidence because its admission usurped the province of the jury in determining credibility. 39 Wn. App. at 656–57.

F. *Admission of expert testimony that child sexual abuse victims exhibit particular behavioral symptoms.*

Stevens next argues that the court erred in permitting Dr. Jenny to testify about common symptoms associated with sexual abuse. The testimony was:

Q: What behavioral signs and symptoms would be important for you [to] have in putting together the whole picture?

A: Things that are commonly found as part of sexual abuse which [need] to be treated when they're found, things like sexually acting out, enuresis, which is bed wetting, or daytime wetting, and lack of bowel control, psychosomatic problems like abdominal pain, headache, anger, tantrums, nightmares, difficult behavior that children have that make their management complicated.

Prior to trial, the court ruled that the State could not introduce evidence that the children fit a "medical profile" of sexual abuse. It did allow the State to elicit testimony that, based on an expert's own experience or training, he or she found common behavioral symptoms to exist in sexually abused children generally.

Stevens relies on *State v. Black,* 109 Wn.2d 336, 745 P.2d 12 (1987), to argue that introduction of this testimony was tantamount to allowing the doctor to testify that C and D fit a medical profile of sexually abused children. In *Black,* the expert witness testified to the existence of a specific profile of symptoms for rape victims, known as the rape trauma syndrome, and that the victim in that case fit the profile. 109 Wn.2d at 339. The Supreme Court found that the rape trauma syndrome was not a scientifically reliable means of proving lack of consent in a rape case, and that the expert's testimony that the victim fit the profile invaded the province of the jury. 109 Wn.2d at 348–50.

Washington cases decided since *Black* have made clear that expert testimony generally describing symptoms exhibited by victims may be admissible when relevant and when not offered as a direct assessment of the credibility of the victim. *State v. Ciskie,* 110 Wn.2d 263, 279–80, 751 P.2d 1165 (1988); *Madison,* 53 Wn. App. at 764–65. In *Ciskie,* the Supreme Court approved of expert testimony

describing the symptoms of battered woman syndrome in the hypothetical. The expert did not testify directly that the victim fit the profile; if she had, her testimony would have invaded the province of the jury. Without that prejudicial aspect, however, the Supreme Court found that the evidence was helpful to the jury's understanding of a matter outside the competence of an ordinary lay person, and the trial court had properly limited admission of the testimony for that purpose. 110 Wn.2d at 279. In addition, the defense had challenged the victim's credibility and attempted to show that her behavior was inconsistent with that of a rape victim. The expert testimony offered rebutted this testimony. 110 Wn.2d at 278.

In *Madison*, the court considered whether general testimony concerning the "recantation phenomenon" was properly admitted to rebut testimony that the complaining witness in a child sexual abuse case had recanted prior to trial. 53 Wn. App. at 764. The expert offered various explanations why a victim might recant, but never asserted that the complaining witness fit the pattern. The court followed *Ciskie* and distinguished *Black* on the basis that the evidence was not offered to prove an element of the crime directly. 53 Wn. App. at 765.

Similar to *Ciskie,* here the expert did not testify that the victims fit any controversial "profile" or "syndrome" of abuse.[8] Nor did she rely on any unusual technique or theory as a basis for her testimony. She only testified generally as to behaviors consistent in sexually abused children that she had observed in her own experience working in the field.

Moreover, the defense theory was that the atypical behaviors exhibited by the children were not the result of sexual abuse by Stevens. On cross examination, the defense repeatedly attempted to show that these behaviors could

---

[8]Stevens does not argue and we decline to decide whether evidence of a syndrome of sexual abuse is admissible under *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923). *See Madison,* 53 Wn. App. at 766.

have been the result of other traumas in the children's lives. The offered testimony was relevant to rebut this theory. The court did not abuse its discretion in admitting the evidence.

G. *Did cumulative error deprive the defendant of a fair trial?*

Stevens argues that cumulative error deprived him of a fair trial. We disagree, since we find that no prejudicial error occurred.

## II
### Sentencing Issues

A. *Imposition of an exceptional sentence.*

The trial judge found two aggravating factors justifying the imposition of an exceptional sentence: abuse of trust and victim vulnerability. Stevens argues that both of the court's reasons for imposing an exceptional sentence are improper, and, in any event, that the sentence is clearly excessive.

In reviewing an exceptional sentence, we must first determine whether the trial court's reasons are supported by the record. RCW 9.94A.210(4)(a); *State v. McAlpin,* 108 Wn.2d 458, 462, 740 P.2d 824 (1987); *State v. Nordby,* 106 Wn.2d 514, 517, 723 P.2d 1117 (1986). Because this is a factual question, the sentencing judge's reasons will be upheld unless they are "clearly erroneous". *McAlpin,* 108 Wn.2d at 462; *Nordby,* 106 Wn.2d at 517–18. Second, the reviewing court must independently determine whether, as a matter of law, the trial court's reasons justify an exceptional sentence. RCW 9.94A.210(4)(a); *McAlpin,* 108 Wn.2d at 463; *Nordby,* 106 Wn.2d at 518. There must be "substantial and compelling" reasons for imposing such a sentence. RCW 9.94A.120(2); *McAlpin,* 108 Wn.2d at 463. Finally we examine whether the sentence imposed was "clearly excessive." *McAlpin,* 108 Wn.2d at 467.

1. <u>Abuse of trust</u>. The Sentencing Reform Act of 1981 (SRA) expressly provides that abuse of trust is an appropriate aggravating factor justifying an exceptional sentence

if the crime is an "economic offense" and "[t]he defendant used his or her position of trust . . . to facilitate the commission of the current offense." RCW 9.94A.390(2)(c)(iv). Abuse of trust has been expanded and recognized as a legitimate aggravating factor in cases involving noneconomic offenses. *State v. Pryor,* 56 Wn. App. 107, 114, 782 P.2d 1076 (1989) (indecent liberties), *review granted,* 114 Wn.2d 1001 (1990); *State v. Creekmore,* 55 Wn. App. 852, 863, 783 P.2d 1068 (1989) (second degree felony murder), *review denied,* 114 Wn.2d 1020 (1990); *State v. Brown,* 55 Wn. App. 738, 754, 780 P.2d 880 (1989) (indecent liberties and statutory rape in the first degree), *review denied,* 114 Wn.2d 1014 (1990); *State v. Jackmon,* 55 Wn. App. 562, 568, 778 P.2d 1079 (1989) (first degree attempted murder); *State v. Davis,* 47 Wn. App. 91, 95, 97–98, 734 P.2d 500 (assault and robbery), *review denied,* 108 Wn.2d 1029 (1987); *State v. Harp,* 43 Wn. App. 340, 342–43, 717 P.2d 282 (1986) (second degree statutory rape and indecent liberties).

Stevens argues that the trial judge erred in finding "abuse of trust" as an aggravating factor because abuse of trust applies only in cases containing intentional mens rea elements. Because first degree statutory rape has no mens rea element,[9] Stevens argues, abuse of trust is an improper aggravating factor as a matter of law.

---

[9]Stevens is correct in his assertion that there is no mens rea element for first degree statutory rape. *See State v. Abbott,* 45 Wn. App. 330, 333–34, 726 P.2d 988 (1986), *review denied,* 107 Wn.2d 1027 (1987). However, as discussed in *Abbott,* there is a distinction between knowledge of which specific acts have been defined by the Legislature as constituting sexual intercourse and a person's ability or capacity to know, at the time he commits those acts, that he is in fact performing those acts. The former is mens rea, which the State is not required to prove under *Abbott.* The latter is not mens rea, but an issue of mental capacity. 45 Wn. App. at 333.

In determining whether abuse of trust exists as an aggravating factor, the critical question is not whether the defendant had specific intent to commit the crime, but whether he or she used a position of trust to facilitate the commission of the act that constitutes the crime. RCW 9.94A.390(2)(c)(iv). That Stevens was in his role as baby–sitter at the time he performed voluntary acts of molestation is the critical focus of the inquiry. The law assumes, as noted in *Abbott,* that

500

Stevens' argument relies on an overly broad interpretation of *State v. Crutchfield*, 53 Wn. App. 916, 771 P.2d 746 (1989). In *Crutchfield*, the defendant was convicted of first degree manslaughter. There the defendant had lied to the victim to induce her to come to visit his apartment the night of her death. He had also misled the victim by telling her that a friend of his in the apartment was "full of hot air", when in fact he knew that the friend had violent propensities. 53 Wn. App. at 919. After conviction, the trial court imposed an exceptional sentence, in part based on a finding that by lying to the victim, the defendant had abused a position of trust.

The appellate court found that while these events demonstrated that a relationship of trust existed between the defendant and the victim, the trial court erred in using "abuse of trust" as an aggravating factor to justify an exceptional sentence for the crime of first degree manslaughter. 53 Wn. App. at 923. In first degree manslaughter the mental state of culpability is "recklessness". The *Crutchfield* court reasoned that a person who acts recklessly does not intend to commit an offense, and therefore, the defendant's reassurances to the victim were not made "to facilitate" the commission of the crime. *Crutchfield*, 53 Wn. App. at 923. The court distinguished two other cases approving use of abuse of trust in noneconomic offenses: "Both cases involve crimes of intent and fit the language of the statute in that the 'defendant used [his] position of trust . . . to facilitate the commission of the . . . offense.'" 53 Wn. App. at 923 (quoting RCW 9.94A.390(2)(c)(iv)).[10]

Unlike *Crutchfield*, this case involves a crime which does fit the language of the exceptional sentence

Stevens had full mental capacity at the time he committed the offense, such that his actions were the product of free choice.

[10] One of the cases distinguished, however, was *Harp*, which involved statutory rape and indecent liberties. 43 Wn. App. at 342–43. While the crime of indecent liberties contains an intent element, statutory rape does not. *Compare* former RCW 9A.44.070 *with* former RCW 9A.44.100.

statute: Stevens deliberately used his position of trust to facilitate a knowing performance of acts that constitute the crime of first degree statutory rape. The crimes occurred while Stevens baby–sat the children: as caretaker, he abused his position of trust by raping them. It is clear under prior appellate decisions that abuse of the role of caretaker properly increases the culpability of the defendant. *See Pryor,* 56 Wn. App. at 114–15; *Creekmore,* 55 Wn. App. at 862; *Brown,* 55 Wn. App. at 754; *Harp,* 43 Wn. App. at 343. In *Crutchfield,* the defendant did not know that the victim would be killed at the time he abused his trust; it could not be said he used his position to facilitate the commission of the crime.

The emphasis in *Crutchfield* on a crime of intent was unnecessary to the holding. The applicability of abuse of trust as an aggravating factor turns on the language of RCW 9.94A.390(2)(c)(iv). The proper inquiry is whether the defendant used his position to facilitate the commission of the crime, not whether the State has to prove a specific intent to commit the crime. While mens rea should be a guiding factor in analyzing whether abuse of trust exists in a particular case, it should not be dispositive. To the extent *Crutchfield* is inconsistent with this principle, it is limited to its facts.

2. Vulnerability of the victim. The trial court made the following written finding: "[t]he victim in count III, [D,] was extremely vulnerable by virtue of her tender years." While Stevens concedes that this finding was proper as a matter of law,[11] he argues that the finding is not supported by the record. Specifically, he argues that the court's oral findings do not indicate that the court actually made a distinction based on vulnerability of one victim compared to

---

[11]Stevens acknowledges that under *State v. Fisher,* 108 Wn.2d 419, 424, 739 P.2d 683 (1987), a trial court may find particular vulnerability by age as a basis for an exceptional sentence, even where age is an element of the crime. The key determination is whether vulnerability by virtue of the age of the victim distinguishes the crime from other similar crimes.

the other. Additionally, as Stevens points out, the sentences on both counts are the same, 94 months.

The State concedes that the trial court made no distinction in its oral decision between the children in terms of their vulnerability. It argues that the sentence should nevertheless be affirmed because the record supports a finding that both children were vulnerable based on age and special relationship.

While we may look to the judge's oral opinion if the findings are ambiguous, *see Crutchfield,* 53 Wn. App. at 920 n.1, here the findings are unambiguous: the trial court intended the aggravating factor of vulnerability to apply only to the count involving D. We find that the record supports the finding that D was a particularly vulnerable victim due to her tender years; she was only 3 years old at the time the abuse occurred. *See State v. Fisher,* 108 Wn.2d 419, 424, 739 P.2d 683 (1987).

We find no problem with the fact that the sentence lengths for each count are the same, even though two aggravating factors apply to the count involving D and only one properly applies to the count involving C. Because both factors properly apply to the count involving D, and the sentences run concurrently, any error was harmless and does not prejudice Stevens.

3. <u>Was the sentence clearly excessive</u>? The standard range for Stevens' offenses is 46 to 61 months. The trial court imposed a sentence of 94 months for each count, to be served concurrently. Stevens argues that the record is devoid of any reason for imposing this length of sentence. He maintains that the court relied on two improper reasons—that prison programs for sexual offenders are not well developed; and that Stevens would be released after serving two–thirds of his sentence.

While there must be "substantial and compelling reasons" for going outside the standard range, once that requirement is met, this court reviews whether the length

of the sentence is clearly excessive under an abuse of discretion standard. *State v. Oxborrow,* 106 Wn.2d 525, 529–31, 723 P.2d 1123 (1986).

The trial judge did discuss the availability of prison programs at the sentencing hearing:

> When I look at this—and I'm satisfied that either my choice is either the top of the range or an exceptional sentence—what I believe I have to contemplate is that presently the programs in the prison are not well developed. I choose the words carefully, because I'm certain that they will improve. . . . And I do firmly believe that within a period of time we will have something that is going to be positive for you.
>
> In the meantime I'm satisfied that you should not be free to be around youngsters, and I'm satisfied that I should impose an exceptional sentence up.

After imposing the sentence, the judge also mentioned good time: "And I hope that [a rehabilitation program] will be available and that there is a way, then, of my shortening this. I do not have any pleasure in saying you do eight years less good time."

Neither comment indicates that the judge relied on those factors in imposing the sentence. In fact, the judge explicitly stated: "[I]t's clear that I have two substantial factors to rely on [to impose an exceptional sentence], and that is the position of trust and vulnerability." Additionally, the written findings of fact indicate he only relied on two aggravating factors.

Regardless of whether the judge did improperly rely on good time or lack of prison programs, however, the two aggravating factors of particular vulnerability and abuse of trust justify the exceptional sentence. The trial court's sentence of 94 months on each count is affirmed.

B. *Imposition of a condition upon release from prison requiring Stevens to complete a sexual deviancy program.*

 Stevens argues, and the State concedes, that the trial court improperly required Stevens to complete a sexual deviancy program after his release from prison. Because

Stevens was not sentenced under any of the special first–time offender or sexual offender options, the trial court was restricted to ordering crime–related prohibitions. The court did not have authority under the SRA to order affirmative participation in rehabilitation. *See* former RCW 9.94A-.030(7); *State v. Parramore,* 53 Wn. App. 527, 529–30, 768 P.2d 530 (1989); D. Boerner, *Sentencing in Washington* § 4.5 (1985).

This condition is deleted from Stevens' sentence. In all other respects, the conviction and sentence are affirmed.

The remainder of this opinion has no precedential value. Therefore, it will not be published, but has been filed for public record. *See* RCW 2.06.040; CAR 14.

PEKELIS and FORREST, JJ., concur.

Review denied at 115 Wn.2d 1025 (1990).